You may proceed. Thank you, Your Honor. May it please the court. Good morning. My name is Tom Arkush. I represent Dr. Minas and I'd like to seek to reserve two minutes. The government convicted Dr. Michael Minas of 80 counts of drug trafficking based upon standards that describe the good practice of medicine, but not upon whether he was practicing medicine. Our contention is that given the indictment, the evidence allowed, and the jury instructions, Dr. Minas was convicted for the poor practice of medicine, but not for the failure to practice medicine. In summary, our case can be summarized in a what-how analysis. The what in this trial was whether or not Dr. Minas was practicing medicine. Was he in the alley selling prescriptions for unmarked bills or was he in an office examining people, treating people, and diagnosing people and treating people? That's the how. The court in this case, however, allowed the government to compare the how or the behavior not to a standard of whether he was are admittedly unscientific, arbitrary, subjective, discretionary, fairly recent, that don't themselves describe the practice of medicine. There are two things wrong with this in our view. The first is, as then district judge Pregerson wrote in the Fick-Lim decision, it's Fick-Lim, I believe, regulatory guidelines and unscientific guidelines should not be allowed in these cases because they become the standard. That's precisely what happened here. His how or his behavior was wrong. There was no definition given of the practice of medicine to this jury, even upon request. The elements the government must prove to convict a licensed physician of trafficking scheduled medicines is that the prescriptions were outside the regular course of practice and not for legitimate medical purpose. Litigants in courts struggle with this paradigm because these elements can or the disputed or the experimental practice of medicine that is not criminal drug trafficking or they can describe criminal drug trafficking. To clarify the distinction between trafficking and mere bad medicine, even intentional bad medicine, the Supreme Court in Moore and this court in Feingold have directed trial courts to gauge a doctor's behavior against the standards of medical practice. To cite Moore as quoted in Feingold, the question is did the doctor so wantonly ignore the basic protocols of the medical profession that he acted as a large-scale pusher, not a physician. Against this background, the failure in this case is the court declined to tell the jury what doctors do that make what they do the practice of medicine. Instead, the jury was only told what good doctors do. The court countenanced evidence from the government of two types to gauge Dr. Minus' behavior and neither of these standards define the practice of medicine. The first guideline that the government put on was that Dr. Minus prescribed opioids in excess of 100 milligrams morphine equivalent or MEDs. The This occurred even though the record rests uncontroverted that no science supports how much morphine equivalent is too much. In fact, the government's expert testified it was based upon what some people would say. That's at the supplemental Exeter Record 454. The 100 milligram was used as a bright line on the government's exhibit to demarc whether or not the behavior was criminal. The purpose of the MED construct is to equate the potency of different medicines, not to determine how much is too much. Second, the court allowed the introduction of opioid administrative guidelines over objection to show that Dr. Minus did not follow these guidelines and therefore his behavior was criminal. The court allowed this even in face of uncontroverted evidence that the purpose of the guidelines is to check addiction and diversion and not to define drug trafficking or the legitimate practice of medicine. The guidelines are by their own terms an art and not a science-made guidelines. And the guidelines offer seven non-criminal reasons doctors often make inappropriate prescriptions. In some, the court admitted a twin set of discretionary guidelines against which the jury was left to judge whether Dr. Minus was or was not trafficking drugs. These were not the basic protocols of which Feingold spoke. These are at best civil standards of care regarding how careful medicine is practiced, but not standards defining what is the practice of medicine. This comparison of behavior to a civil standard was clearly called out and rejected by another district court in our in 2014 by then Judge Pregerson and Fick Lim. Judge Pregerson ruled correctly the expert could not gauge the defendant's behavior against either a reasonable person standard or, quoting, standards of care set out by a professional board or regulatory body or as to other legal requirements not part of the Substances Act. And introducing civil or regulatory standards has the strong potential to confuse the jury as to the mens rea required in the case. Comparing Dr. Minus's behavior to a reasonable doctor or to normal doctors or to other doctors or to any doctors, which are all in this record, and applying prescriptions over 100 MED or prescribing and contravention of discretionary guidelines is exactly what Judge Pregerson said was a civil standard and was exactly what happened in this case. Either Judge Pregerson or Judge Lodge is correct, but not both of them. Worse yet, although the court gave lip service to not allowing an expert witness to that Dr. Minus did not prescribe for either a legitimate or even legal medical purpose. Such opinions go directly to Dr. Minus's state of mind. Indeed, at page 45 of his brief, the government admits its expert, quote, ultimately concluded that the defendant intentionally distributed the controlled substances outside the scope of practice and not for a Now that the government no longer is in trial but instead advocates before this court, it spotlights, approves, adopts, and quotes the correct protocol at page 38 of its brief. From the Fick-Lim case, this is the quote, The jury should have been instructed that the practice of medicine in Idaho is examination, diagnosis, and treatment. Instead, the court declined Dr. Minus's instruction following Idaho Code Section 54-1803, thus leaving the jury in the dark about one thing, the one thing they needed to know to determine whether Dr. Minus was trafficking drugs or practicing medicine, that is, what is the practice of medicine. Add to this misguidance the unallowable evidence of social harm caused by opioids in our society today, and there is little wonder that in its verdict form on some months it was adjudicated by this jury to have been the practice of medicine in his prescriptions. Later months, it was drug trafficking, and then it flip-flops again in later months to be again the practice of medicine. And note that the diagnosis in the patients did not change. Counsel, wasn't there several witnesses, at least, who testified that he prescribed drugs for people he never examined, and he didn't even take a medical history, and he didn't look at their medical history? That's correct. There was testimony to that effect except the examination part. And those items that you're listing, Your Honor, are items found in this set of guidelines that sets out a list of obligations far in excess of examination, diagnosis, and treatment. Those guidelines provide, and they're listed in Government Exhibit 250, which is admitted in Excerpt of Record 673, a list of the steps that those guidelines require, which are all well beyond examination, diagnosis, and treatment. To wit, evaluation, a treatment plan, an opioid trial, periodic drug testing, consultation and referral, consideration of discontinuing opioid therapy, adequate medical records, and in this case, there can be no prescription over the bright line of 100 MED. If he failed to jump those hoops, the jury convicted. And that is the problem with imposing a civil standard into these cases where even the bad practice of medicine is not criminal drug trafficking. I'm not here to defend how he practiced medicine or whether or not he'd won a malpractice trial. He may well not have, but he was practicing medicine under the definition in Idaho. The indictment recites, distribution and violation of the guidelines is a crime. The judge bought it. He wrote in his order, denying the motion to dismiss the indictment, the jury will have to determine if Minas was or was not complying with the standards of medical care in Idaho based on the Idaho BOM policy. So that was the standard, whether he was not complying with the standards of medical care based on the Idaho BOM policy. And that's the policy that contains all of those steps. So if he didn't comply with all of those steps, whether or not he was practicing medicine, it was criminal behavior, even under the instructions of the government, of the court. The government itself calls the guidelines in the indictment a benchmark. So he was judged by a malpractice standard. The prosecutors in this case decry a use of a bright line rule in their briefing except their own 100 MED bright line. This is perhaps in part because the Department of Justice has sent special prosecutors all over this country for the sole purpose of obtaining opioid convictions. This case demonstrates that a different bright line rule is absolutely necessary. We must religiously avoid allowing experts to opine that a doctor's transgression of unscientific, arbitrary guidelines that are subjective and created for safety purposes equates to a doctor having no legitimate medical purpose. The standard of conviction will change with the expert in the courtroom. When we speak of the practice of medicine, we must tell the jury what that is. If there are no questions, I'll reserve the remainder of the time. Thank you. May it please the court, Darcy Ward for the United States. The jury in this case was properly instructed that in order to find the defendant guilty, that they must find that he knowingly and intentionally acted outside the usual course of professional practice and without a legitimate medical purpose in accordance with this court's decision in Feingold. The defendant requested that a jury instruction be given stemming from the practice of medicine as derived from Idaho Code section 54-1803. The district court in this case correctly held that that was derived from a licensing statute and was not appropriate as the defendant wanted to set forth what the legitimate practice of medicine was. That does not speak to the standard of care and it does not speak to the criminal instruction of how you would find the defendant guilty. Instead, what the district court did in this case is it included an instruction regarding good faith in combination with the Feingold instruction. In that situation, the district court set forth in instruction 34, beginning at page 138 of the excerpts of record, that the jury should find the defendant not guilty on counts where they determined that in good faith in medically treating a patient, that the defendant had distributed controlled substances for a legitimate medical purpose. That is, that he had distributed them lawfully and it goes on to talk about in accordance with what the doctor believed to be proper medical practice. And so looking at the jury instructions as a formulation of the whole in this case, the district court did not abuse its discretion in leaving out reference to a licensing statute. Instead, it properly instructed the jury. And that goes along with the discussion in this case of the Board of Medicine policy for the use of opioid analgesics in the treatment of chronic pain. That's an Idaho Board of Medicine policy that was derived from the Federation of State Medical Boards policy. In that case, it also is in accordance with Feingold, where this court found that only after assessing the standard to which medical professionals generally hold themselves can a determination be made as to whether the conduct is criminal. And that is what the Board of Medicine policy was used for in this case. It was used to set forth that standard to which medical professionals generally hold themselves. Every expert during the trial, both the government and defense, had heard of the Board of Medicine policy. And the defendant himself, during testimony at Excerpt of Record 363, noted in response to what the purpose of the policy was, he testified that its purpose has several reasons. One is certainly awareness, but also to aid practitioners in the prevention of the misuse and abuse of chronic pain medications. And later, during cross-examination, admitted that many of the concepts contained within that Board of Medicine policy were global concepts at SCR 621. That accords with the testimony that was provided by the government's experts as well, that this was really looking towards a standard of care. Then, the government's expert, Dr. Moore in particular... Of course, when we think of standard of care, we're often thinking of malpractice cases and tort cases in state courts. So, what's to distinguish between a doctor who doesn't meet the standard of care, doesn't perfectly diagnose and treat, and someone who actually has no legitimate medical purpose for the treatment? How does the jury distinguish that here? The jury first understands, Your Honor, the idea of what physicians do in this case, and then it makes the determination, and that's why the jury instructions are important, as to the fact that there was no legitimate medical purpose. And the way in which the government discussed that was not only testimony from individual patients, but also then the government's expert went through patient by patient, and count by count, looking at the different prescriptions, the medical records that were provided, and that information, and determined that each of these prescriptions that were written by the defendant were written without any legitimate medical purpose, and written outside the professional practice. And that is supported by the evidence. For example, Your Honor, looking at one patient, and this ties in somewhat this concept of the morphine equivalence dose. One patient testified about the different prescriptions that he had received, and Dr. Moore, the government's expert, went through that and calculated that, on average, his morphine equivalence dose was at 1,075 MEDs a day, or more than 10 times the general consensus, and that can be found at SER 520. That particular patient, at varying times, received, in addition to other controlled substances, a number of opioid narcotics. Fentanyl, oxycodone, morphine, hydromorphone. And that patient himself described that, while he was taking these drugs, that he was a zombie, couch monster, and that his body was physically deteriorating. The government's expert, after reviewing the file, not hearing that patient's testimony, said, Dr. Moore said, if he were still alive, he would be severely intoxicated, at SER 526. This looks at that analysis, where you're considering what this patient received, based on his Board of Pharmacy records, the prescriptions the defendant wrote, as Dr. Moore described at other times, the astonishing amount of pain narcotics that were given to these patients. And then you're hearing from this actual patient, who's describing very similar circumstances. And in reality, these prescriptions, based on similar testimony from other patients, one patient received 1,500 oxycodone 30 mg pills in one month, at one point, and then on another month, may receive 1,200, and then also received prescriptions for fentanyl patches. That goes in this idea that this was really beyond any type of legitimate medical purpose. And the morphine equivalence dose in this case was described by Dr. McGeorge as a recommended threshold, and by Dr. Moore as a cautionary zone or a consensus. It was not presented as a bright line rule. However, what the jury was presented with in this case was a way in which, as Dr. Moore put it, to compare apples to apples. This defendant was prescribing opioid narcotics, various different types, as noted. And so in order to put these all in a place in which you could talk about them together, they had to convert them. And in this case, the morphine equivalence dose was used. This was a standard that all the experts were familiar with. The defendant himself told officers during his interview that he had calculated the MED and noted that he was on the mark about half the time at SER 623 to 624. Yet when he has a patient who's averaging 1,075 MED a day, it seems clear that the defendant failed to partake in calculating that, or if he did, simply did not care that he was not practicing medicine but was acting to distribute controlled substances to all of these patients. And so it was set forth as a type of tool, again, so that apples to apples could be compared. The experts in this case, after reviewing the defendant's record, noted that extraordinary treatment requires extraordinary documentation. The defendant's actions in this case were extraordinary to the extent that he was prescribing so much oxycodone, oxycodone to patients who came in to him on their first appointment and admitted that they had had problems, for example, with tramadol in the past and were receiving suboxone to detoxify, as was told to him by one patient at SER 261 to 262. And yet that patient is the one who received up to 1,500 oxycodone 30 milligram pills in one month. Another patient came in and a review of the records in that situation noted that Dr. Morris said that he was receiving an unheard of ridiculous amount of medication and that was for patient JN. The government provided the court with some of the prescriptions in this case that were written to that patient, Exhibits 56 through 60. And on the face of those prescriptions are misrepresentations made by the defendant. This idea that these prescriptions were being written for 30 days at a time when prescriptions are being written on October 3rd, October 7th, October 21st, October 28th, and November 11th. Looking at all this, your honors, the district court correctly decided not only to uphold the sufficiency of the evidence in this case, but also in properly instructing the jury as well as performing its gatekeeping functions that set forth an aleator for whether or not certain types of expert evidence should come in. And so for those reasons, your honor, unless the court has any additional questions. It appears not. I would ask that you affirm the district court. Thank you. Two minutes for rebuttal. Thank you very much. Your honors, counsel said that these guidelines were the standards to which medical professions generally hold themselves. I don't take issue with that. They're how a good practitioner practices pain control. Is that, however, the medical protocol spoken of in Feingold? No, it's not. It's whether you're practicing medicine, whether you're practicing good medicine to those standards, average medicine, bad medicine, or intentionally bad medicine under the Moore case. Are you practicing medicine, not are you meeting these civil guidelines for the good practice of medicine? I'll give you an example. Counsel spoke of the MED of 1075 that the government's expert just lit up about. Our expert said, I've done that. It calls for those kind of behaviors. Counsel says no documentation. Some of the cases, and there were convicted counts and were convicted according to what the jury ultimately said afterwards, it's in the record, because of those violations. But that doesn't mean he wasn't practicing medicine. That just means Dr. Moore, who testified on behalf of the government, didn't know what he was doing. The problem with comparing and putting these civil guidelines into the record is this kind of confusion. And it is compounded by the refusal of the district court to define for the jury what constitutes the practice of medicine versus criminal drug trafficking. I would ask this court to straighten that out. And I would ask this court to reverse it for lack of evidence. Thank you. Thank you. Thank both counsel for your arguments, also for your patience in wading through all of the other arguments. The court is now adjourned.
judges: McKeown, Gould, Rothstein